[Crim. No. 3647. Fourth Dist., Div. Two. Dec. 22, 1969.]

THE PEOPLE, Plaintiff and Respondent, v.
LEIGHTON AARON STINES, Defendant and Appellant.

## COUNSEL

Kurilich, Slack & Ballard and Richard E. Maher for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Howard J. Schwab, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KERRIGAN, Acting P. J.**—Defendant appeals his conviction of murder in the second degree. (Pen. Code, § 187.)

The defendant arrived at a union meeting in Santa Ana about 8 p.m. on May 28, 1968. From the moment he entered the hall, his attitude was belligerent and his conduct outrageous. While there is some conflict in the evidence as to the extent of his intoxication, it is apparent that he was very drunk.

The local union had an unsavory reputation for employing force and violence against its own members. It was common practice for members to carry hand guns to meetings. The officers exercised dictatorial control. The defendant hated and detested the hierarchy.

Upon entering the lobby of the union hall, defendant asked the individual checking identification, "Is Joe Seymour here?" Seymour was a high-ranking union officer. When he received no reply, he said, "I came here to kill Joe Seymour. I've written him three letters, and he hasn't responded to any of them. I'm going to kill me a business agent tonight and maybe he'll answer my letters." He repeated the threat twice. Seymour was not present, but there were 65-70 members and local officials in attendance.

When defendant took a seat in the auditorium, the meeting had already commenced. A reading of the minutes of a previous meeting was in progress. When the reading was concluded, defendant requested that a portion be reread. Ewell "Whitey" Edwards, the business agent of Local 12, was on stage acting as secretary.

After defendant's request had been complied with, Edwards left the stage to visit the restroom. He was followed by the defendant, whose language was banal, his manner aggressive. He told Edwards, "I think you fellows are a bunch of ―― ――. Joe Seymour and all you officers are a bunch of bastards." When Edwards left the restroom, defendant followed him, mouthing vulgarities and insults. As Edwards reached the anteroom leading into the meeting hall, the defendant grabbed his arm and told him he was not going back into the meeting. Edwards replied, "Look, I don't even know who you are. I don't know you." Defendant replied, "I know you, you son of a bitch, and I've been looking for you."

Having been sufficiently provoked by the defendant's insults, the business agent started to take off his coat and invited the defendant outside to settle the matter. His purpose in offering to fight was to get the defendant outside and bar his re-entry.

At least two members were in the lobby and witnessed the disturbance: Lee Dyer and Robert Davis. Davis was acting as sergeant-at-arms [security officer] for the meeting. When defendant declined the offer to go outside, Dyer successfully dissuaded Edwards from pursuing the matter. Edwards started to turn away from the defendant and return to the auditorium. Suddenly, the defendant produced a gun. Edwards said, "Look out. That guy has got a gun." Dyer, Davis and Edwards advanced towards the defendant. Defendant raised the gun to a level position parallel to the floor and then raised it towards the ceiling and back down to a parallel position in one continuous motion. He fired, striking Davis in the face. The defendant knelt down next to the victim and said, "I didn't mean to kill you, buddy. I meant to kill him," pointing at Edwards. While the defendant was in a crouching position next to the victim, Dyer reached down and removed the revolver from his pocket.

At approximately 8:39 p.m., within moments after the shooting, a local officer responded to a report of the shooting. On entering the union hall lobby, he observed the victim on the floor. He took the defendant into custody. Dyer turned the .22 revolver over to the officer.

The bullet had pierced the victim's right cheek, and he died shortly after the officer's arrival.

Upon examining the gun, the investigating officer found four live rounds of ammunition and one empty cartridge. An unfired .22-caliber bullet was later found in defendant's pocket.

Defendant was administered a breathalyzer examination at the jail about 9:25 p.m. There were two readings: .19 and .20. He was also given a constitutional advisement. Defendant stated he understood his rights. While the officer was administering the breathalyzer, defendant said, "Well, I've

had a few beers today, but I'm not drunk." He further said, "I didn't mean to shoot the guy," or "I didn't mean to hit the guy that I shot. I meant to kill 'Whitey'." [Edwards.]

Shortly after midnight, a blood test was administered to determine the alcoholic content of defendant's blood. The blood sample reflected an alcoholic level of .18 percent. The criminalist indicated that if defendant had taken his last drink at 7 p.m. preceding the shooting, the blood alcohol level at 8:25 would have been .24 or .25. Consequently, the chemical tests reflect a sufficient concentration of alcohol in the blood to establish intoxication.

Numerous witnesses testified on behalf of the defendant. The majority of defense witnesses attested to the union's reputation for violence and blacklisting practices. A cocktail waitress testified that defendant had been drinking until 7:30 p.m. the night of the shooting. Defendant's wife testified that he was "pretty well intoxicated" when she saw him earlier the same evening.

The defendant's testimony may be summarized as follows: He carried a firearm to union meetings for protection purposes; he had been drinking heavily all day; after leaving a bar he went home, but did not recall the trip home; he recalled taking a bath, but did not remember returning to the tavern; he did not remember arming himself with any kind of a gun; he did not remember arriving at the union hall, being seated in the auditorium, addressing any remarks or questions to the chair, going to the men's room, or quarreling with "Whitey" Edwards; he had no recollection of firing, but hazily remembered hearing a noise such as a gun shot; he did not remember seeing the victim fall, being arrested, taking a breathalyzer test, or the conversation in the breathalyzer room; he had lost his memory in the past on two occasions when drinking; he had apparently gone to the union hall to find out why he was "laid off"; he was unhappy because the union had laid him off before apprentices.

Defendant raises several issues in attacking the judgment, but only two require resolution for purposes of this appeal: (1) The trial court erred by failing to give nonstatutory manslaughter instructions on its own motion; and (2) the giving of a second degree murder instruction based on the felony-murder rule was error.

While the trial court properly instructed the jury on the elements of first and second degree murder (Pen. Code, §§ 187-189), defined voluntary manslaughter in statutory terms (Pen. Code, § 192, subd. 1), distinguished murder from statutory manslaughter (CALJIC 310, 311, 311-A, 311-B and 311-C), and rendered an abridged version of the diminished capacity instruction suggested in *People* v. *Conley,* 64 Cal.2d 310, 324-325 [49 Cal.

Rptr. 815, 411 P.2d 911], involving murder and statutory voluntary manslaughter (CALJIC 305.1), the court did *not* instruct on the crime of "nonstatutory voluntary manslaughter."

There are two types of voluntary manslaughter: statutory and nonstatutory. (*People* v. *Castillo,* 70 Cal.2d 264, 270-271 [74 Cal.Rptr. 385, 449 P.2d 449].) Voluntary manslaughter is the intentional killing of a human being without malice. "Statutory" voluntary manslaughter is an intentional killing in which malice is lacking because the killing occurred under circumstances or sufficient provocation such as to rouse the reasonable man to a fit of passion or sudden quarrel. (Pen. Code, § 192, subd. 1.) "Nonstatutory" voluntary manslaughter is the intentional killing of a human being in which the defendant did not attain the mental state constituting malice because of mental illness, mental defect, or intoxication. (*People* v. *Conley, supra,* 64 Cal.2d 310, 324-325.) Nonstatutory voluntary manslaughter is a homicide which may be intentional, voluntary, deliberate, premeditated and unprovoked; it differs from murder in that the element of malice is negated by showing that defendant's mental capacity has been reduced by mental illness, mental defect, or intoxication. (*People* v. *Graham,* 71 Cal.2d 303, 315 [78 Cal.Rptr. 217, 455 P.2d 153].)

In the case under review, defendant testified that he was drunk, did not remember any significant event after he showered at home, had no recollection of firing the fatal bullet, did not intend to hurt anyone, have a fight with anybody, or shoot or kill anyone, and that he did not "ever rationally consider or think over or premeditate harm to anybody. . . ." The scientific evidence indicates gross intoxication at the time of the shooting. There was also lay testimony reflecting intoxication.

The Attorney General urges that the state expert was unable to testify as to the effect of liquor upon the elements of premeditation and malice, and submits that the subject requires expertise. But the same argument has been made and rejected before in the following language: "It is urged that no instruction on manslaughter need be given when a defense of unconsciousness caused by voluntary intoxication is presented unless the defense is supported by expert testimony regarding diminished capacity. Although expert testimony with regard to a defendant's inability to achieve a specific state of mind may be necessary when the defense of diminished capacity is based upon mental disease or defect, such testimony is not essential to a determination by a jury that a defendant has diminished capacity to achieve a specific state of mind because of intoxication. Nonexpert witnesses may offer opinion testimony based on their observations

as to a person's intoxication (Citation) and the jury may infer the presence and extent of a defendant's intoxication from evidence of his behavior and the amount of his drinking. (Citation.)" (*People* v. *Conley, supra,* 64 Cal.2d 310, 324-325.)

In a criminal prosecution, the court should instruct the jury upon every material question upon which there is any evidence deserving of any consideration whatsoever, even if not requested. (*People* v. *Wilson,* 66 Cal.2d 749, 759 [59 Cal.Rptr. 156, 427 P.2d 820]; *People* v. *Modesto,* 59 Cal.2d 722, 727 [31 Cal.Rptr. 225, 382 P.2d 33].) The defense of diminished capacity is properly raised where the defendant testifies that he had been drinking, that he had no memory of the actual shooting or of certain events occurring immediately thereafter. (*People* v. *Aubrey,* 253 Cal.App.2d 912, 920 [61 Cal.Rptr. 772].) A murder conviction is reversible because of the failure of the trial court to instruct on nonstatutory manslaughter where the defendant testifies he did not intend to kill, could not remember what he had done, and where a blood test establishes alcohol sufficient for intoxication; evidence of intoxication may be considered by the jury to rebut malice. (*Ibid.*)

While the court here rendered an abbreviated version of the diminished capacity instruction suggested in *People* v. *Conley, supra,* 64 Cal.2d 310, 324-325 (CALJIC 305.1), the instruction is inadequate in that it does not explicitly define nonstatutory manslaughter. (*People* v. *Castillo, supra,* 70 Cal.2d 264, 271.)

In a homicide case, where there is evidence of diminished capacity due to mental disease, mental defect or intoxication tending to negate the element of malice, the trial court's failure to instruct on nonstatutory manslaughter is prejudicial per se (*People* v. *Castillo, supra,* 70 Cal.2d 264, 271-272) as the defendant has suffered the denial of a jury trial on all of the issues presented by the evidence. (*People* v. *Graham, supra,* 71 Cal.2d 303, 315-316.)

While a reversal of the conviction is compelled by reason of the trial court's failure to define nonstatutory manslaughter, the court also erred in giving the second degree felony-murder instruction (CALJIC 305 (Rev.)), which provides: ". . . the unlawful killing of a human being with malice aforethought is murder of the second degree in any of the following cases: . . . when the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life, such as assault with a deadly weapon."

 Under the felony-murder doctrine, the intent required for the conviction of murder is imputed from the specific intent to commit the concomitant felony. (*People* v. *Sears,* 62 Cal.2d 737, 745 [44 Cal.Rptr. 330, 401 P.2d 938]; *People* v. *Fain,* 70 Cal.2d 588, 599 [75 Cal.Rptr. 633, 451 P.2d 65].) A second degree felony-murder instruction may not be properly given when it is based upon a felony which is an integral part of the homicide and which constitutes an offense included therein. (*People* v. *Ireland,* 70 Cal.2d 522, 539 [75 Cal.Rptr. 188, 450 P.2d 580].) An assault with a deadly weapon which results in death is not a felony which justifies the giving of the felony-murder instruction where there is evidence of diminished capacity due to intoxication because such defense negates the element of malice, whereas the felony-murder doctrine would relieve the jury of a specific finding of malice. (*People* v. *Ireland, supra,* 70 Cal.2d 522, 539; *People* v. *Schindler,* 273 Cal.App.2d 624, 635-636 [78 Cal.Rptr. 633].)

The judgment of conviction is reversed.

Tamura, J., and Mitchell, J. pro tem.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.