[Crim. No. 15823. In Bank. Dec. 28, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
BOZZIE BRYANT BURTON III, Defendant and Appellant.

**COUNSEL**

Patrick J. Sampson, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Norman N. Flette, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**SULLIVAN, J.**—Defendant Bozzie Bryant Burton III, a 16-year-old minor was charged by information with two counts of murder (Pen. Code, § 187) and a third count of assault with intent to commit murder. (Pen. Code, § 217.) After a jury trial he was found guilty as charged on two counts of murder in the first degree and guilty of assault (Pen. Code, § 240), a lesser offense than that charged in the third count, but necessarily included therein. Defendant was sentenced to the term prescribed by law on the two counts of murder and to 180 days in county jail on the count of assault, each sentence to run concurrently. He appeals from the judgment of conviction.

Defendant contends that his confession to the above charges was obtained in violation of the rules announced in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] and that its admission into evidence over his objection constitutes reversible error. We agree and, therefore, reverse the judgment.

### Count Three (Assault on Vicky Price)

On December 13, 1968, at 9:15 p.m., Vicky Price was sitting in her car, which was parked in a parking lot at a shopping center in Compton. Defendant approached her car on the driver's side, put a gun to her head and ordered her to get out of the car. While she was attempting to comply with this order, she heard a voice addressing her from the other side of the car. The next thing she knew defendant's gun had gone off and wounded her. Defendant fled.

### Counts One and Two (Murders of Joseph and Isabelle Diosdado)

Six days later on December 19, 1968, about noon, the dead bodies of Joseph and Isabelle Diosdado were discovered lying on the floor of the back

room of their feed store in Compton. They had each been shot twice. The cash register was empty and coins were scattered on the floor. The bullet recovered from Vicky Price and the bullets removed from the Diosdados were all fired from the same gun.

On February 14, 1969, at 7 a.m., defendant was arrested and taken to the Compton police station. Upon arrival at the police station, he was placed in a cell near the door, then underwent booking procedures for 30 to 40 minutes, and finally was removed to another cell for questioning. While he was being booked, his father arrived at the police station and asked to see him. The request was refused. The police thereafter advised defendant of his *Miranda* rights, interrogated him, and obtained a confession.

In fact, defendant made statements on three separate occasions in which he: (1) admitted shooting Vicky Price, but claimed he was strongly under the influence of marijuana; (2) admitted being present at the shooting of the Diosdados, but denied doing the shooting and (3) admitted shooting the Diosdados and explained the circumstances in detail.

When the case was called for trial, defendant moved, pursuant to section 405 of the Evidence Code, to exclude the confession on the ground that it was (1) involuntary and (2) illegally obtained in violation of *Miranda* v. *Arizona, supra,* 384 U.S. 436. A hearing was held prior to the selection of the jury. At the conclusion of the hearing the trial judge, without specifically reviewing the evidence, found that the People had met its burden of showing the confession was voluntary, not coerced and not illegally obtained.

Defense counsel pointed out to the court in summation at the end of the hearing that "on several occasions he [defendant] asked to see his parents, and also has heard testimony from a parent, namely the father, that on several occasions he asked to see the minor, and on each occasion each was refused permission one to see the other," but did not specifically urge the defendant's request to see his parents invoked his Fifth Amendment privilege under *Miranda* v. *Arizona, supra,* 384 U.S. 436.[1] Since defendant now raises that contention before us, we must first decide whether it was established that defendant did in fact request to see his parents.

---

[1]The People do not object that the contention that defendant's request to see his parents invoked his Fifth Amendment privileges has been raised too late. We agree, since one of the stated grounds for objecting to the admission of the confession was that it was illegally obtained in violation of *Miranda* v. *Arizona, supra,* 384 U.S. 436, and defendant's testimony with respect to his request to see his parents was highlighted to the court by defense counsel in his summation.

Defendant testified: "That morning when I came in [taken to police station for booking] after they had put me in one cell and put me in another cell, and I asked them could I see my parents, and they said, 'No'." This testimony was never contradicted. When urged to the court by defense counsel, it elicited no argument from opposing counsel, nor indication of disbelief from the trial court. It was not at all necessary for the trial court to disbelieve this testimony to determine that defendant, who on three separate occasions made a full confession, did so freely and voluntarily after having specifically and intelligently waived his *Miranda* rights, which a police officer had carefully explained to defendant.

The People urge, however, that the testimony of Officer Armstrong, quoted in the margin,[2] adequately contradicted defendant's testimony, because the officer's testimony indicates he was not with defendant when defendant claimed to make the above statement. Defense counsel indicated to defendant in his questioning with respect to this matter that defendant's request had been directed to Officer Armstrong, that it was the latter who had denied the request and defendant agreed.

We think the above is inadequate to contradict defendant's testimony. At no time did Officer Armstrong or any other officer deny defendant requested to see his parents. We are persuaded, after a close reading of the testimony presented at the section 405 hearing, that whether defendant did or did not request to see his parents was not considered a major issue at that time. It has become so upon appeal. Defendant's testimony that he requested to see his parents was uncontradicted at that time, and stands unchallenged now when viewed upon review except for the quoted testimony of Officer Armstrong, which in itself is inadequate to meet the People's burden of showing that defendant did not say what he testified he did say. Therefore, we are satisfied that the record adequately establishes that defendant requested to see his parents and that this request was denied.

It is unclear from the record whether this request was made during transfer from the booking cell to the interview room or in the interview room itself. However, the request was made just prior to the commencement of interrogation and at a time when defendant's father was at the police station.

---

[2]"Except for the time lapse. I was with him from the house to the Police Department, and he was delivered by me and one or two other officers to the booking area. At that time when he was turned over to the jailer. I then left and went to my office and, as I testified before, a time lapse of approximtely 30 to 40 minutes— I am not sure. I cannot testify to the exact time— that I was away from him during the booking processing."

Prior to commencing questioning, but subsequent to the denial of defendant's request to see his parents, a police officer carefully explained to defendant his *Miranda* rights. The record shows that when thus advised of his rights, defendant indicated to the officer that he understood such explanation and that he waived these rights. Thereafter he made a full confession on three separate occasions.

■ Defendant, although not claiming this confession to have been involuntary, contends that it was unlawfully obtained since his request to see his parents at or near the commencement of interrogation was an invocation of his Fifth Amendment privilege under the rules established in *Miranda* v. *Arizona, supra,* 384 U.S. 436, and further elaborated in this state in *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625]; *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323] and *People* v. *Randall* (1970) 1 Cal.3d 948 [83 Cal.Rptr. 658, 464 P.2d 114]. We agree.

The United States Supreme Court in *Miranda,* noting that incommunicado interrogation is at odds with an individual's right not to be compelled to incriminate himself, stated: "Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 458 [16 L.Ed.2d 694, 714].) In *Miranda,* the Supreme Court set down four warnings which must be given persons in custodial surroundings, and then elaborated on the procedure subsequent to the giving of such warnings, as follows: "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. [Fn. omitted.] At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 473-474 [16 L.Ed.2d 694, 723].) In *People* v. *Randall, supra,* 1 Cal.3d 948, 954, we observed that "This obligation on the police to entirely terminate custodial interrogation upon invocation of the Fifth Amendment privilege is one of the primary 'protective devices' fashioned by *Miranda.* [Fn. omitted.]"

In cases where the suspect makes no express assertion, the crucial question is what behavior is necessary to constitute an invocation of the Fifth Amendment privilege. We have stated several times that no particular

form of words or conduct is necessary to constitute such an invocation. "A suspect may indicate such a wish in many ways." (*People* v. *Ireland, supra,* 70 Cal.2d 522, 535.) "To strictly limit the manner in which a suspect may assert the privilege, or to demand that it be invoked with unmistakable clarity (resolving any ambiguity against the defendant) would subvert *Miranda's* prophylactic intent." (*People* v. *Randall, supra,* 1 Cal.3d 948, 955.)

Any words or conduct which "reasonably appears inconsistent with a present willingness on the part of the suspect to discuss his case freely and completely with police *at that time* [fn. omitted]" (*People* v. *Randall, supra,* 1 Cal.3d 948, 956) must be held to amount to an invocation of the Fifth Amendment privilege. In *Fioritto* we held that a refusal by a suspect to sign a waiver of his constitutional rights amounted to an invocation of his Fifth Amendment privilege. In *Ireland* we held that when the suspect stated "Call my parents for my attorney" he thereby asserted the privilege. In *Randall* we held that a suspect's telephone call to his attorney in and of itself invoked the privilege.

In this case we are called upon to decide whether a minor's request to see his parents "reasonably appears inconsistent with a present willingness on the part of the suspect to discuss his case freely and completely with police *at that time.*" (*People* v. *Randall, supra,* 1 Cal.3d 948, 956.) It appears to us most likely and most normal that a minor who wants help on how to conduct himself with the police and wishes to indicate that he does not want to proceed without such help would express such desire by requesting to see his parents. For adults, removed from the protective ambit of parental guidance, the desire for help naturally manifests in a request for an attorney. For minors, it would seem that the desire for help naturally manifests in a request for parents. It would certainly severely restrict the "protective devices" required by *Miranda* in cases where the suspects are minors if the only call for help which is to be deemed an invocation of the privilege is the call for an attorney. It is fatuous to assume that a minor in custody will be in a position to call an attorney for assistance and it is unrealistic to attribute no significance to his call for help from the only person to whom he normally looks—a parent or guardian. It is common knowledge that this is the normal reaction of a youthful suspect who finds himself in trouble with the law.

The People advance two arguments in opposition. First, they contend that defendant's request to see his parents did not clearly give notice to the police that he was asserting his Fifth Amendment privilege, since such request could have been made for many purposes. We rejected the same argument in *Randall.* There the People argued that a telephone call to an attorney could manifest a desire to get bail, or merely inform him

of his arrest just as well as manifesting a desire to remain silent or have the attorney present, and that the equivocal nature of the telephone call made it distinguishable from *Ireland* where the defendant upon being asked whether he had anything to say, responded "Call my parents for my attorney." We there said: "In any event, we are not disposed to assume as a general matter that a telephone conversation with an attorney such as occurred in the case at hand is not a manifestation of a suspect's intention to assert his privilege. . . . The People have the burden of demonstrating that a questioned confession meets the constitutional tests of admissibility. [Citations.] When, as appears here, the suspect to the knowledge of the police completes a call to his attorney, the People—if they contend that the fact of such a call should not be considered an invocation of the privilege—must affirmatively demonstrate that the suspect was not thereby indicating a desire to remain silent until he had obtained the full advice of his counsel." (*People* v. *Randall, supra,* 1 Cal.3d 948, 957.)

Similarly here we are not disposed to assume as a general matter that a request by a minor at or near the inception of interrogation to see his parents is not an indication of that minor's unwillingness to continue talking with police or of a desire for help in how to conduct himself with police and thus not a manifestation of that minor's intention to assert his privilege. Therefore, the People have the burden of affirmatively demonstrating that such was not the desire on the part of defendant. Here, the People did not meet this burden.

Secondly, the People contend that because defendant's request occurred prior to the interrogation and prior to the giving of the *Miranda* warning, it was unlikely that the police would understand the request as an invocation of the privilege. The Supreme Court clearly stated in *Miranda,* as quoted, *ante,* page 381, that "[i]f the individual indicates . . . *at any time prior to* . . . questioning, that he wishes to remain silent, the interrogation must cease." (Fn. omitted; italics added.) (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 473-474.) Indeed, this argument really seems to be a further elaboration of the lack of notice argument discussed above, and the short answer is that the People have offered nothing in the way of affirmative proof that defendant did not intend to assert his privilege.

Accordingly we hold that when, as in the instant case, a minor is taken into custody and is subjected to interrogation, without the presence of an attorney, his request to see one of his parents, made at any time prior to or during questioning, must, in the absence of evidence

demanding a contrary conclusion, be construed to indicate that the minor suspect desires to invoke his Fifth Amendment privilege. The police must cease custodial interrogation immediately upon exercise of the privilege. The police did not so cease in this case, the confession obtained by the subsequent questioning was inadmissible, and, therefore, the admission of such confession was prejudicial per se and compels reversal of the judgment on all counts. (*People* v. *Randall, supra,* 1 Cal.3d 948, 958; and cases there cited.) ■ The admission of this confession constitutes reversible error even though it was subsequently preceded by a knowing and intelligent waiver of the privilege, as we held under identical circumstances in *Fioritto, Ireland* and *Randall,* because: "After the initial assertion of the privilege, the defendant is entitled to be free of police-initiated attempts to interrogate him. Any statements made by a defendant in response to such questioning cannot be characterized as voluntary." (*People* v. *Randall, supra,* 1 Cal.3d 948, 958.)

We now turn to defendant's contention that it was error, in the circumstances of this case, to instruct the jury on first degree felony murder, because the underlying felony was armed robbery. He claims that armed robbery is an offense included *in fact* within the offense of murder and, therefore, under the rule announced in *People* v. *Ireland, supra,* 70 Cal.2d 522, 538-540 as applied in *People* v. *Wilson* (1969) 1 Cal.3d 431 [82 Cal.Rptr. 494, 462 P.2d 22], such offense cannot support a felony-murder instruction.[3]

"Murder," as defined in Penal Code section 187, "is the unlawful killing of a human being . . . with malice aforethought." In *Ireland,* we said: "The felony-murder rule operates (1) to posit the existence of malice aforethought in homicides which are the direct causal result of the perpetration or attempted perpetration of *all* felonies inherently dangerous to human

---

[3]The trial judge instructed the jury, in pertinent part, as follows: "Concerning the charges of murder in Counts I and II of the information, there are two sets of principles of law which may apply, depending on your findings of fact. [Par.] The first is called the felony-murder doctrine which I will define for you and *which only applies if you find that there was a robbery or attempted robbery committed by the defendant.* [Par.] The second set of principles contains all possible doctrines of law that can apply to a murder charge other than the felony-murder doctrine, and I will define these principles for you also. [Par.] Now first, here is the felony-murder doctrine: [Par.] *The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a result of the commission or attempt to commit the crime of robbery and where there was in the mind of the perpetrator the specific intent to commit such crime of robbery is murder of the first degree.* [Par.] The specific intent to commit robbery and the commission or attempt to commit such crime must be proved beyond a reasonable doubt. [Par.] If you find that the defendant was intoxicated at the time of the alleged offense, you should consider his intoxication in determining whether the defendant had the specific intent to commit robbery." (CALJIC No. 302.F (2d rev.).) (Italics added.)

life, and (2) to posit the existence of malice aforethought *and* to classify the offense as murder of the first degree in homicides which are the direct causal result of those six felonies specifically enumerated in section 189 of the Penal Code. [Citations.]" (*People* v. *Ireland, supra,* 70 Cal.2d 522, 538.)

■ The net effect of this imputation of malice by means of the felony-murder rule is to eliminate the possibility of finding unlawful killings resulting from the commission of a felony to be manslaughter, rather than murder. ■ Even intentional killings can be mitigated to voluntary manslaughter if the killing occurred with sufficient provocation to arouse the reasonable man to a fit of passion or sudden quarrel or if the defendant did not attain the mental state of malice due to mental illness, mental defect or intoxication. (*People* v. *Stines* (1969) 2 Cal.App.3d 970, 976 [82 Cal.Rptr. 850].) ■ Unintentional killings in the appropriate circumstances may well be mitigated to involuntary manslaughter, or even not be subject to criminal penalty.

In *Ireland* the "defense . . . rested its entire case upon a contention that defendant's mental state at the time of his act—as affected by cumulative emotional pressure and the ingestion of alcohol and prescribed medications was not that required for murder." (*People* v. *Ireland, supra,* 70 Cal.2d 522, 531.) The defendant in that case shot his wife with a gun. The judge instructed the jury on the felony-murder rule, utilizing assault with a deadly weapon as the supporting felony. The effect of such instruction, as *Ireland* pointed out (70 Cal.2d at p. 539, fn. 13) was, therefore, to substantially eviscerate the defense of diminished capacity to negative malice, since malice was imputed. The net effect of this imputation would be to hold that all intentional killings accomplished by means of a deadly weapon were murder regardless of the circumstances and could never be mitigated to manslaughter, since all such killings included in fact an assault with a deadly weapon. We held that such effect was impermissible; "This kind of bootstrapping finds support neither in logic nor in law. We therefore hold that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged." (Fn. omitted.) (*People* v. *Ireland, supra,* 70 Cal.2d 522, 539.)

In *Wilson* the underlying felony which supported the felony-murder instruction was burglary—specifically entry coupled with the intent to commit assault with a deadly weapon. Since in *Ireland* we had held that assault with a deadly weapon could not support an instruction on second degree felony murder, in *Wilson* we were faced with the question whether

it could support first degree felony murder because coupled with an entry. We concluded there was no meaningful distinction between assaults with deadly weapons indoors and outdoors, saying: "Where the intended felony of the burglar is an assault with a deadly weapon, the likelihood of homicide from the lethal weapon is not significantly increased by the site of the assault. Furthermore, the burglary statute in this state includes within its definition numerous structures other than dwellings as to which there can be no conceivable basis for distinguishing between an assault with a deadly weapon outdoors and a burglary in which the felonious intent is solely to assault with a deadly weapon." (*People* v. *Wilson, supra,* 1 Cal.3d 431, 441.) Thus, even though burglary is one of the felonies specifically enumerated in Penal Code section 189, we excluded burglary from the operation of the felony-murder rule in those cases where the intended felony was assault with a deadly weapon for the reasons stated in *Ireland*.

Defendant contends that the language and reasoning of *Ireland* and *Wilson* compel us to hold that armed robbery is included in fact within murder and, therefore, cannot support a felony-murder instruction.[4] He argues that armed robbery includes as a necessary element assault with a deadly weapon by the following chain of reasoning: robbery "is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear" (Pen. Code, § 211); thus robbery is assault (force or fear directed against a person) coupled with larceny, which when accomplished by means of a deadly weapon necessarily includes in fact assault with a deadly weapon; any charge of murder with respect to a killing arising out of armed robbery then necessarily includes in fact assault with a deadly weapon and cannot support a felony-murder instruction.

The net effect of defendant's argument would be to eliminate the application of the felony-murder rule to all unlawful killings which were com-

---

[4]At oral argument counsel for defendant claimed that *People* v. *Sears* (1970) 2 Cal.3d 180 [84 Cal.Rptr. 711, 465 P.2d 847] added further support to his position. In *Sears* a husband, living apart from his wife, unlawfully entered her home armed with an iron bar, attacked her and, in the ensuing fracas, killed his stepdaughter. We held that the felony-murder instruction predicated upon burglary committed by an entry coupled with the intent to commit assault with a deadly weapon was erroneous under the authority of *Ireland* and *Wilson*. The distinguishing factor between *Wilson* and *Sears* was the fact that the evidence could be construed to show that the husband entered with the intent to commit assault only upon the wife and that therefore the assault upon the stepdaughter was a collateral felony. However, this court concluded that the doctrine of transferred intent applied, so that the entry with intent to commit assault upon the wife was the sole underlying felony. The problem of transferred intent is not raised in the instant case. *Sears* insofar as pertinent to this case in no way expanded or altered *Wilson*.

mitted by means of a deadly weapon, since in each case the homicide would include *in fact* assault with a deadly weapon, even if the homicide resulted from the commission of one of the six felonies (arson, rape, mayhem, robbery, burglary or lewd and lascivious acts upon the body of a child) enumerated in section 189 of the Penal Code. It is, of course, possible to interpret our language in *Ireland*[5] and *Wilson* to mean merely that if the facts proven by the prosecution demonstrate that the felony offense is included in fact within the facts of the homicide and integral thereto, then that felony cannot support a felony-murder instruction. However, we reject this interpretation of that language and its consequent assertion that the felony-murder rule has been abolished in all homicides accomplished by means of a deadly weapon as unwarranted both in logic and in principle.

We conclude that there is a very significant difference between deaths resulting from assaults with a deadly weapon, where the purpose of the conduct was the very assault which resulted in death, and deaths resulting from conduct for an independent felonious purpose, such as robbery or rape, which happened to be accomplished by a deadly weapon and therefore technically includes assault with a deadly weapon. Our inquiry cannot stop with the fact that death resulted from the use of a deadly weapon and, therefore, technically included an assault with a deadly weapon, but must extend to an investigation of the purpose of the conduct. In both *Ireland* and *Wilson* the purpose of the conduct which eventually resulted in a homicide was assault with a deadly weapon, namely the infliction of bodily injury upon the person of another. The desired infliction of bodily injury was in each case[6] not satisfied short of death. Thus, there was a single course of conduct with a single purpose.

However, in the case of armed robbery, as well as the other felonies enumerated in section 189 of the Penal Code, there is an *independent felonious purpose,* namely in the case of robbery to acquire money or property belonging to another. ▇ Once a person has embarked upon a course of conduct for one of the enumerated felonious purposes, he comes directly within a clear legislative warning—if a death results from his commission of that felony it will be first degree murder, regardless of the

---

[5]"We therefore hold that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged." (Fn. omitted.) (*People v. Ireland, supra,* 70 Cal.2d 522, 539.)

[6]*Wilson* involved two separate entries, one into the apartment through the front door and one into the bathroom. Each was coupled with the intent to commit assault with a deadly weapon. However, the crucial entry for the purpose of the first degree felony-murder instruction, was the entry into the bathroom by defendant bearing a shotgun for the purpose of inflicting violent injury upon the body of his wife.

circumstances. ■ This court has reiterated numerous times that "The purpose of the felony-murder rule is to deter felons from killing negligently or accidentally by holding them strictly responsible for killings they commit." (*People* v. *Washington* (1965) 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130].) The Legislature has said in effect that this deterrent purpose outweighs the normal legislative policy of examining the individual state of mind of each person causing an unlawful killing to determine whether the killing was with or without malice, deliberate or accidental, and calibrating our treatment of the person accordingly. Once a person perpetrates or attempts to perpetrate one of the enumerated felonies, then in the judgment of the Legislature, he is no longer entitled to such fine judicial calibration, but will be deemed guilty of first degree murder for any homicide committed in the course thereof.

*Wilson*, when properly understood, does not eliminate this rule as urged by defendant, but merely excludes from its effect one small area of conduct, which would be irrationally included, due to the unusual nature of burglary. The key factor as indicated earlier in the enumerated felonies is that they are undertaken for a felonious purpose independent of the homi- ■ ■ In the normal case, burglary is also undertaken with an independent felonious purpose, namely to acquire the property of another. In such instances the felony-murder rule would apply to burglary as well, even if the burglary were accomplished with a deadly weapon. However, in *Wilson* the entry was coupled with the intent to commit assault with a deadly weapon, the defendant in that case bursting through the bathroom door intending to do violent injury upon the body of his wife. We were there presented with the exact situation we faced in *Ireland*, namely a single purpose, a single course of conduct, except that in *Wilson* the single course of conduct happened to include an entry, and thus technically became burglary all of which brought the incident within the ambit of section 189 of the Penal Code. We merely excluded from the first degree felony-murder rule the special circumstances of *Wilson* where the entry was with the intent to commit assault with a deadly weapon because we found them indistinguishable from those in *Ireland*. We regard the holding in *Wilson* as specifically limited to those situations where the entry is coupled with the intent to commit assault with a deadly weapon.

Defendant in this case by embarking upon the venture of armed robbery brought himself within the class of persons who the Legislature has concluded must avoid causing death or bear the consequences of first degree murder. ■ The trial judge quite correctly instructed on felony murder based on homicides directly resulting from the commission of armed robbery.

Defendant next contends that section 405 of the Evidence Code, by making the trial judge's determination of the voluntariness of a confession final, violates his right to trial by jury embodied in article I, section 7 of the state Constitution. He argues that it was error for the trial judge not to instruct the jury to determine for itself the question of the voluntariness of a confession, once the trial judge had made a preliminary determination of voluntariness.

Prior to the enactment of section 405 of the Evidence Code, effective January 1, 1967, the law was as defendant now urges. We held in *People v. Gonzales* (1944) 24 Cal.2d 870 [151 P.2d 251] that once the trial judge had made an initial determination that the confession was voluntary, the defendant was entitled to present evidence to the jury for its final determination as to voluntariness. In *People v. Bevins* (1960) 54 Cal.2d 71 [4 Cal.Rptr. 504, 351 P.2d 776], we held that the court had a duty to instruct the jury *sua sponte* to determine for itself the voluntariness of the confession, and if it found it involuntary, then to disregard the confession altogether.

The Legislature by enacting section 405 of the Evidence Code specifically rejected this rule. In the legislative committee comment to the section, the reason for the change is carefully explained: "The existing law is based on the belief that a jury, in determining the defendant's guilt or innocence, can and will refuse to consider a confession that it has determined was involuntary even though it believes that the confession is true. Section 405, on the other hand, proceeds upon the belief it is unrealistic to expect a jury to perform such a feat. Corroborating facts stated in a confession cannot but assist the jury in resolving other conflicts in the evidence. The question of voluntariness will inevitably become merged with the question of guilt and the truth of the confession; and, as a result of this merger, the admitted confession will inevitably be considered on the issue of guilt. The defendant will receive a greater degree of protection if the court is deprived of the power to shift its fact-determining responsibility to the jury and is required to exclude a confession whenever it is not persuaded that the confession was voluntary."

This procedure has received at least the tacit approval of the United States Supreme Court (see *Jackson v. Denno* (1963) 378 U.S. 368, 378 [12 L.Ed.2d 908, 916, 84 S.Ct. 1774, 1 A.L.R.3d 1205]). The identical procedure is utilized to determine the question whether evidence has been obtained in violation of the law of search and seizure and has been approved by this court. (*People v. Gorg* (1955) 45 Cal.2d 776, 780-781 [291 P.2d 469].) The Legislature's finding that a defendant will be better protected by thrusting the full responsibility upon the trial judge is en-

tirely reasonable. Moreover, the Legislature has quite reasonably indicated that it is removing from the jury a task that was in all practical terms impossible—in short, nothing of substance has been removed from the province of the jury. Defendant has suggested no reason why the voluntariness of a confession must be determined by a jury while the legality of the seizure of evidence need not be. Neither has defendant cited any authority indicating that a determination of the voluntariness of a confession is an inherent part of the right to a jury trial expressed in article I, section 7 of the state Constitution. We reject defendant's contention that section 405 of the Evidence Code violates article I, section 7 of the state Constitution.

Defendant finally contends that the instruction given with respect to proof of intent (CALJIC No. 73)[7] conflicted with and vitiated the instruction given on diminished capacity (CALJIC No. 305.1 (New) 1967 Pocket Part).[8] The gist of the instruction on intent was to limit lack of sound mind to idiocy, lunacy, or insanity and thus order the jury to find the requisite sound mind supporting the requisite intent unless the defendant was an idiot, a lunatic or insane. Furthermore, this instruction directed the jury to assume defendant was sane. However, the instruction on diminished capacity quite correctly informed the jury that a "substantially reduced mental capacity, whether caused by mental illness, intoxication or any other cause" could negate the ability to form specific required mental states. There is certainly a potential conflict in the instruction which could well mislead the jury.

We need not now decide whether such a conflict would be fatal, but for purposes of guidance of the court upon retrial direct the trial court's at-

---

[7]CALJIC No. 73 provides: "The intent with which an act is done is manifested by the circumstances attending the act, the manner in which it is done, the means used, and the sound mind and discretion of the person committing the act. All persons are of sound mind who are neither idiots nor lunatics nor affected with insanity.

"For the purposes of the issues now at trial you must presume that the defendant was sane at the time of his alleged conduct which, it is charged, constituted the crime described in the information."

[8]CALJIC No. 305.1 (New) provides: "If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, intoxication or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder. Thus, if you find that the defendant's mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, premeditate, deliberate, or form an intent to kill, you cannot convict him of a wilful, deliberate and premeditated murder of the first degree. Also, if you find that his mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, harbor malice aforethought, as it has been defined for you, you cannot find him guilty of murder of either the first or second degree."

tention to CALJIC (3d ed.)[9] numbers 3.34, 3.35 and 8.77 where the problem has been perceived and very adequately answered. In the note on use of the instruction on the proof of intent (CALJIC (3d ed.) No. 3.34), the editors suggest that trial judges delete the second paragraph directing the jury to assume defendant is of sound mind if there is evidence of diminished capacity. It is noteworthy that in the revised instruction on intent, sound mind is left undefined and the sentence referring to idiots, lunatics or insane people has been deleted. We are satisfied that this is a correct and fully adequate way to handle the situation.

The judgment is reversed.

Wright, C. J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

**McCOMB, J.**—I dissent. I would affirm the judgment for the reasons ex-

---

[9]CALJIC No. 3.34 provides: "The intent with which an act is done is shown by the circumstances attending the act, the manner in which it is done, the means used, and the soundness of mind and discretion of the person committing the act.

"[For the purposes of the case on trial, you must assume that the defendant was of sound mind at the time of his alleged conduct which, it is charged, constituted the crime described in the information.]"

CALJIC No. 3.35 provides: "When a defendant is charged with a crime which requires that a certain specific intent or mental state be established in order to constitute the crime or degree of crime, you must take all the evidence into consideration and determine therefrom if, at the time when the crime allegedly was committed, the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming the specific intent or mental state essential to constitute the crime or degree of crime with which he is charged.

"If from all the evidence you have a reasonable doubt whether defendant was capable of forming such specific intent or mental state, you must give defendant the benefit of that doubt and find that he did not have such specific intent or mental state."

CALJIC No. 8.77 provides: "If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, mental defect, intoxication, or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder and voluntary manslaughter.

"Thus, if you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he did, maturely and meaningfully, premeditate, deliberate, and reflect upon the gravity of his contemplated act, or form an intent to kill, you cannot find him guilty of a willful, deliberate and premeditated murder of the first degree.

"Also, if you find that his mental capacity was diminished to the extent that you have a reasonable doubt whether he did harbor malice aforethought, you cannot find him guilty of murder of either the first or second degree.

"Furthermore, if you find that his mental capacity was diminished to the extent that he neither harbored malice aforethought nor had an intent to kill at the time the alleged crime was committed, you cannot find him guilty of either murder or voluntary manslaughter."

pressed by Mr. Justice Allport in the opinion prepared by him for the Court of Appeal, Second Appellate District, Division Three (*People* v. *Burton*, 2 Crim. 18352, filed June 17, 1971, certified for nonpublication).