[Crim. No. 19623. First Dist., Div. One. Sept. 23, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
CLAY E. MORRISON, Defendant and Appellant.

COUNSEL

Roger W. Pierucci for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Martin S. Kaye, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**NEWSOM, J.**—Appellant Clay E. Morrison, a minor 17 years of age, was tried as an adult and convicted after jury trial of the crimes of first degree murder, with a use enhancement, and second degree burglary, also with a use enhancement. He appeals from the judgment and sentence of life imprisonment.

The factual background may be summarized as follows.

Appellant concedes that, on July 29, 1978, he burglarized the residence of Jose Tulipano, a 68-year-old construction worker, after the latter left for work. After searching for 20 minutes, appellant sensed a presence in the house and hid in a closet. Tulipano, who had returned to the house, found appellant, and, according to appellant shouted out, "I ought to kill you but I'm going to call the police."

Leaving appellant in the closet, Tulipano left the room; returning moments later, he ordered appellant out of the closet. When appellant emerged, according to his testimony, Tulipano struck at him with a knife.

A struggle ensued, during which Tulipano cut appellant's hand. It ended with Tulipano dead of scissors and knife wounds. Appellant testified that he thereupon searched Tulipano's pockets for car keys, washed his hands, and, taking Tulipano's suitcase, ran home.

On appeal, he raises a number of legal issues in support of reversal, which we proceed to consider in the order presented.

I

Appellant first argues reversible error in the trial court's admission of his confession in violation of the *Miranda* standard.[1]

Appellant gave three separate statements concerning his offenses. It is the third of these that he challenges.

On June 29, the day of the crime, appellant received corrective surgery at Kaiser Hospital in San Francisco, for a severe hand wound. He was then placed under arrest and, without his parents' knowledge, transferred to the prison ward of the San Francisco General Hospital. Investigating Officer Erdelatz, who did not immediately learn of the transfer, spoke to appellant's parents and arranged to meet them at the hospital at 10:30 p.m. to discuss the transfer.

At about 10:15, June 29, Erdelatz and Officer Brosch interviewed appellant, admonished him of his *Miranda* rights and told him he might have his parents present at the interview if he desired. He made no such request, but spoke freely, insisting he had nothing to hide, and telling his interrogators he had cut his hand at a football field while playing a "knife game" with a friend.

A few minutes after this interview, Erdelatz met with appellant's parents, and, when Mrs. Morrison asked to see appellant, Erdelatz attempted to arrange for a visit but was told that visiting hours were over and the Morrisons would have to wait until the following day for a visit. Upon being given this information, Mrs. Morrison expressed concern over her son's injury and condition. Erdelatz, who assured her he would arrange for a doctor, testified that he did not construe the request to see her son as equivalent to an attorney's request to see a client.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

When Erdelatz returned to appellant's ward, he was informed that appellant wished to make a second statement, and he thereupon read-monished appellant pursuant to *Miranda*, including the advice that, if he wished, he might have his parents present during questioning. Appellant then asked if his parents were at the hospital, and Officer Brosch mistakenly said they were not. However—and the point seems crucial —Officer Erdelatz corrected Brosch's statement, and again asked appellant if he wished his parents present during interrogation. Upon being told by appellant that he did, Erdelatz terminated the questioning.

Erdelatz went back to the Morrisons and told them they could be present while appellant made a statement; he also summarized appellant's first statement, adding that he thought it a lie—particularly because, as he said, there was no blood on the victim's turned-out pockets, which in his view suggested the presence of an accomplice.

At the ensuing taped interrogation, attended by the Morrisons, appellant was readmonished of his *Miranda* rights. No request was made by appellant or his parents that they be permitted a private interview, nor was such an offer extended by the police. The record shows that, in the ensuing interrogation, Mrs. Morrison actually participated in questioning her son concerning the slaying, and that appellant was, prior to giving a statement, again *Mirandized*, but chose to proceed without objection from himself or his parents. He then admitted the burglary and resulting homicide.

Appellant's testimony at trial, however, was that he asked to talk to his mother *before* the tape was turned on, while his parents were outside, but was told he could not see her until he finished his statement; and that he then twice asked, and was refused, permission to talk to his parents. He believed, he said, that he could not speak to his parents until he told the police "what they wanted to hear."

Appellant's mother also testified that she sought unsuccessfully to speak with appellant prior to his statements, and that she believed her entry into the interrogation room was conditioned on appellant's willingness to make a further statement.

■ In resolving the issue of voluntariness thus presented, "'...it is our duty to examine the uncontradicted facts to determine independent-

ly whether the trial court's conclusion of voluntariness was properly found. . . .'" It must appear so beyond a reasonable doubt. (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672].) To the extent, however, that it is supported by the record, we will accept that version of events most favorable to the People. (*People* v. *Duck Wong* (1976) 18 Cal.3d 178, 187 [133 Cal.Rptr. 511, 555 P.2d 297].)

The facts before us reveal that appellant made his first request to see his parents only after he had given what appears unquestionably to have been a voluntary, exculpatory statement. Properly, no further questions were asked of him until his parents were present. Upon their entry into the room, he was asked if his request was merely to have his parents *present* while he made a statement, and proceeded to conduct himself as if that were in fact his intention.

Appellant's argument now is that, although no coercion may be found in the manner in which the interrogation was conducted, it was improper because his request to see his parents was an invocation of his right to remain silent. In this respect, appellant cites *People* v. *Burton* (1971) 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793], where our Supreme Court held that a minor's request to see one of his parents, in the absence of evidence demanding a contrary conclusion must be construed to indicate the minor's desire to invoke his Fifth Amendment rights. (*Id.*, at pp. 383-384; and cf. *People* v. *Pettingill* (1978) 21 Cal.3d 231, 237-241 [145 Cal.Rptr. 861, 578 P.2d 108].)

The circumstances of the case at bench differ somewhat from those present in *People* v. *Burton, supra*, 6 Cal.3d 375. There, the police flatly denied a request for the minor to see his parent after booking, and proceeded to question him after *Miranda* warnings were waived.

Here, the record shows that immediately following the minor's request to see his parents, interrogation ceased until they were notified and were in fact present. Moreover, neither the minor nor his parents at any time during interrogation gave any indication of a desire that the accused remain silent; in fact, as pointed out earlier, Mrs. Morrison in effect cross-examined her son, expressing doubts concerning his story —indicating thereby that her principal concern was not at that moment protecting her son, but ascertaining the extent of his involvement.

So far as we know, no California Supreme Court case compels the conclusion that a minor's request to have his parent present during interrogation renders subsequent, and otherwise ostensibly voluntary, statements made in their presence involuntary.

■ It may have been, and undoubtedly was, wiser for Morrison to have remained silent; and it may well be that his parents did not understand that they were in a position to advise him that he ought not to admit his implication. The interrogating officers, however, had no obligation to counsel either appellant or his parents as to the best legal course to take, but only to clearly explain to appellant in his parents' presence that he had a constitutional right, inter alia, to remain silent if he chose.

■ Under the circumstances we conclude that appellant's request was not an invocation of his right to remain silent, but the expression of his right—now clear under the holding of *People* v. *Burton, supra*, 6 Cal.3d 375—to have them present during his interrogation.

## II

Appellant next contends that, in order to establish first degree murder under the felony-murder doctrine, the prosecution has the burden of first showing the homicide to be murder. He argues that, where, as here, the defense raises the issue of justifiable or excusable homicide, the prosecution cannot mechanically impute malice to him absent evidence that the homicide was unlawful in the first place.

■ We agree that in the realm of felony murder, as in every other kind of homicide, the element of unlawfulness is essential and must be proven.

The instructions given the jury included the standard explanation of excusable and justifiable homicide. Appellant, however, argues that the instruction is constrictive, and precludes him from arguing exculpation based upon partial excuse, or termination of the underlying felony.

■ A homicide need not occur while the underlying felony is in progress to trigger operation of the felony-murder rule. It is sufficient that the homicide be related to—for example—a burglary, and have resulted as a natural and probable consequence thereof. (*People* v.

*Chavez* (1951) 37 Cal.2d 656, 669 [234 P.2d 632].) As our court expressed the matter in *People* v. *Medina* (1974) 41 Cal.App.3d 438, 451 [116 Cal.Rptr. 133]: "'The law of this state has never required proof of a strict causal relationship between the felony and the homicide. The statute was adopted for the protection of the community and its residents, not for the benefit of the lawbreaker, and this court has viewed it as obviating the necessity for, rather than requiring, any technical inquiry concerning whether there has been a completion, abandonment, or desistence [*sic*] of the felony before the homicide was completed.'" (Quoting from *People* v. *Chavez, supra*, 37 Cal.2d at pp. 669-670.)

■ The killing of Tulipano was determined by the jury to be unlawful when it rejected the submitted excusable or justifiable homicide instruction; implicit in its verdict was a finding that, since the burglary occurred, appellant's malice was thereby imputed, rendering the homicide *unlawful* irrespective of the degree of appellant's moral culpability.

### III

Appellant's argument that juveniles ought not to be certified for trial as adults in felony-murder cases is based upon equal protection provisions of the United States and California Constitutions.

Findings, appellant asserts, ought first to be made concerning (1) the juvenile's ability to harbor a mental state of malice; (2) his ability to rebut the presumption of malice; and (3) a *jury's* view of the existence of malice.

The argument is very ably made, but necessarily rests upon no statutory or decisional authority. Nor is it compelled by considerations of logic, analogy to adult crimes, or public policy. A minor may be found guilty of murder in a juvenile as well as in a superior court. He may of course in such case rebut the imputation of malice by showing that the homicide was lawful; or, if felony murder, that the felony which led to the imputation of malice was not committed.

■ In any event, there is nothing in his mere *minority* which exempts him from the application of what is concededly a rigorous rule. It is common knowledge—now recognized and codified in law[2]—that certain juveniles exhibit a degree of criminal sophistication—or antiso-

---

[2]See Welfare and Institutions Code sections 707, 707.1; *Green* v. *Municipal Court* (1976) 67 Cal.App.3d 794, 800-801 [136 Cal.Rptr. 710].

cial behavior—comparable to the worst adult offenders, and ought realistically to be treated accordingly.

Likewise, where a law exists which is pragmatically designed to protect society, at the admitted cost of occasional extreme severity, there is nothing in the mere minority of one who violates it which ought to immunize him from its operation.

In this respect, nothing in the application of Penal Code section 189 to appellant seems shockingly unfair. The victim, an elderly, decent and unobtrusive working man and father, was savagely and repeatedly stabbed; it would be difficult to characterize his death as the result of an accident in the course of a self-defensive affray.

## IV

Appellant argues, finally, reversible error in the trial court's failure to instruct on both termination of the underlying felony, partial justification, and on the lesser included offenses of other types of murder, citing *People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281], and its progeny for the proposition that a criminal defendant has a right to instructions on "'every material question upon which there is any evidence deserving of any consideration whatever.'" (Quoting from *People* v. *Burns* (1948) 88 Cal.App.2d 867, 871 [200 P.2d 134].)

■ Uncontradicted evidence here established that, when he entered the victim's house, appellant did so with the specific intent to steal. Appellant himself admitted such felonious intent—thereby conclusively furnishing the element of malice which, when added to the subsequent killing, made the crime exclusively felony murder among the degrees of homicide. Given the manner of the victim's death as described by appellant, no lesser offense was supportable under the evidence.

Likewise, appellant's testimony that *after* he killed Tulipano, he stole the latter's bag, obviated the possible consideration that the felony had terminated prior to the killing. No instruction on termination of felony was therefore required.

## V

■ Contrary to appellant's contention, second degree burglary is sufficient as a matter of law to warrant invocation of the felony-murder

rule and to support a conviction based on that theory. This is so "whether or not the particular burglary was dangerous to human life." (*People v. Fuller* (1978) 86 Cal.App.3d 618, 623 [150 Cal.Rptr. 515].)

Affirmed.

Elkington, Acting P. J., and Grodin, J., concured.

Appellant's petition for a hearing by the Supreme Court was denied November 19, 1980.