[Crim. No. 12274. First Dist., Div. Two. Feb. 10, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD WAYNE TURNAGE, Defendant and Appellant.

202

**COUNSEL**

Brian Glick, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, W. Eric Collins and Terry A. Douglas, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**KANE, J.**—Found guilty by jury of first degree murder, defendant appeals, contending that (1) he was arrested without probable cause and that his post-arrest statements were therefore (a) improperly used to support the issuance of a search warrant and (b) erroneously introduced at his trial, and that (2) the trial court erroneously determined that he knowingly and intelligently waived his right to counsel and to remain silent.

For the reasons which follow we have concluded that each of appellant's contentions must be rejected. Accordingly, we affirm the judgment.

Shortly before midnight on September 24, 1972, the California Highway Patrol, checking on a reported abandoned vehicle which was a traffic hazard, discovered a body, later identified as Albert Hudson, in a ravine alongside McEwen Road near Port Costa, California. The vehicle, subsequently determined to have been owned by the victim, contained bloodstains, an expended .32 caliber casing and a pool of liquid which appeared to be vomit and which contained a large piece of red candy. Five additional expended .32 caliber cartridge cases were found at the scene.[1] The autopsy report indicated that Hudson's death had been caused by six to eight gunshot wounds in the head.

The following morning the sheriff's department talked with a medic from the Contra Costa County jail, who had observed a yellow Chevrolet near Hudson's vehicle shortly before the California Highway Patrol discovered the body. As the medic's car approached, the Chevrolet, driven by a young Caucasian or Chicano, sped away. Also, at approximately the same time, an off-duty deputy sheriff observed a man standing near Hudson's vehicle. Initially the deputy described the man as a white male, but later he was not sure; the deputy's wife gave similar equivocal testimony in that it was only her "impression" that the man was a Caucasian. The sheriff's department also learned from a student that a black man was at the scene shortly before the highway patrol arrived. On September 25, 1972, an all points bulletin for two white men was issued by the sheriff's department.

---

[1]No gun was ever found; but at the trial an expert witness opined that three expended cartridge cases found at the scene, and two unexpended .32 caliber bullets found in appellant's car, had been worked through the same weapon, and that all six expended cartridges were fired from an Ortgies .32 caliber automatic pistol.

During the early evening of September 26, 1972, Renee Bennett, appellant's former girl friend, was interviewed by investigating officers at her apartment. During the interview Miss Bennett's mother called to say that appellant was on his way over. Appellant pulled into a driveway in the apartment area complex, but instead of going into the apartment he drove off. He was pursued by the police at high speeds through a residential area and was finally stopped and arrested approximately one to two miles from Miss Bennett's apartment. Appellant was promptly taken to the sheriff's office in Martinez, where he was questioned after being informed of his *Miranda* rights. After the interrogation appellant was booked for murder. Appellant's car and his mother's residence were searched pursuant to a subsequently issued search warrant; unexpended .32 caliber cartridges, which a criminalist determined to have been worked through the murder weapon, were found in the car.

### *Probable Cause to Arrest*

■ " 'The question of probable cause to justify an arrest without a warrant must be tested by the facts which the record shows were known to the officers at the time the arrest was made.' (*People* v. *Talley* (1967) 65 Cal.2d 830, 835 [56 Cal.Rptr. 492, 423 P.2d 564].)" (*People* v. *Lara* (1967) 67 Cal.2d 365, 373-374 [62 Cal.Rptr. 586, 432 P.2d 202].) ■ At the time of appellant's arrest the arresting officers knew: that a felony, presumably murder because of the multiple headwounds, had been committed; that six expended .32 caliber cartridge cases were found at the scene; that according to appellant's former girl friend, Renee Bennett, appellant had previously lived with her, they had subsequently broken up, but appellant was attempting to reestablish the relationship, appellant wanted her to stop her relationship with Hudson, appellant frequently carried a .32 caliber weapon, appellant and Hudson left her apartment together at approximately 10:45 p.m. on the night of the murder, appellant had a tendency to vomit when nervous and often ate hard red candy; that Hudson owned a Studebaker automobile; that Hudson's body was found between 11:30 p.m. and midnight by the highway patrol, approximately 22 miles from the Bennett apartment; that what appeared to be human vomit, with a piece of red candy in it, was found at the scene; that the car at the scene was a Studebaker; that a black man had been seen at the rear of Hudson's car; that appellant was a black man; that non-blacks had been seen in the area of Hudson's car; that during the interview of Miss Bennett her mother called to say that appellant was on his way over; that appellant drove into the driveway of the apartment complex during the interview, but, instead of attempting to see Miss Bennett, drove off.

Appellant argues that the officers did not have reasonable cause to arrest him and that any statements made subsequent to the allegedly invalid arrest could neither be used at his trial nor be used to support the issuance of a search warrant (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 485 [9 L.Ed.2d 441, 453, 83 S.Ct. 407]; *People* v. *Bilderbach* (1965) 62 Cal.2d 757, 766-767 [44 Cal.Rptr. 313, 401 P.2d 921]). Appellant, relying principally on *People* v. *Fein* (1971) 4 Cal.3d 747 [94 Cal.Rptr. 607, 484 P.2d 583], asserts that because the arrest was based primarily upon statements made by Miss Bennett, an informer of unproven reliability, the arrest cannot stand unless the statements were independently corroborated.

Appellant's reliance on *People* v. *Fein* is not justified, for the reasoning of that case is inapposite to the facts here. Although it is true that in *Fein* the police made an arrest based on two untested informants, the critical defect was that the police had only the informants' statements for *both* the commission of the crime of selling narcotics and the defendant's involvement therein.

The prosecution, in *People* v. *Fein, supra,* attempted to establish the informants' reliability by the fact that certain information furnished proved to be correct, namely the location of the apartment where the defendant lived, his name, and the kind of car he drove; but the court held that "in order for corroboration to be adequate, it must pertain to defendant's alleged *criminal* activity; accuracy of information regarding the suspect generally is insufficient. (*People* v. *Gallegos,* 62 Cal.2d 176, 179 [41 Cal.Rptr. 590, 397 P.2d 174]; *People* v. *Reeves,* 61 Cal.2d 268, 274 [38 Cal.Rptr. 1, 391 P.2d 393]; *People* v. *Abbott,* 3 Cal.App.3d 966, 971 [84 Cal.Rptr. 40]; *People* v. *West,* 3 Cal.App.3d 253, 256 [83 Cal.Rptr. 223].)" (P. 753.)

Here, however, we have the existence of the crime, and many other facts relative thereto, clearly established; the only question is whether, at the time of the arrest, there was reasonable cause to believe defendant was the perpetrator. The corroboration necessary here "need not itself amount to reasonable cause to arrest; its only purpose is to provide the element of 'reliability' missing when the police have had no prior experience with the informant. Accordingly, it is enough if it gives the officers reasonable grounds to believe the informant is telling the truth, *for in this type of case* the issue is 'not whether the information obtained by the officers emanated from a reliable source, but whether the officers could reasonably rely upon that information under the circumstances.' (*People* v. *Sandoval* (1966) 65 Cal.2d 303, 308-309 [54 Cal.Rptr. 123, 419

P.2d 187], citing *Willson* v. *Superior Court* (1956) 46 Cal.2d 291, 294-295 [294 P.2d 36].)" (*People* v. *Lara, supra,* 67 Cal.2d at pp. 374-375; italics added.)

We find *People* v. *Lara* to be controlling. There an informant (who was in custody on an unrelated charge) told the police that: he had been given a ride by the murder victim on the day of the crime; the victim and he had encountered two men at a lumberyard who were also given a ride; he had been taken home, leaving the victim with the two men; later, one of the men earlier encountered at the lumberyard told him that he had shot the victim. There, as here, the defendants claimed there was no reasonable cause to arrest because there was no corroboration of the information that had come from an untested informant. The Supreme Court said the test, *"in this type of case"* is not the reliability of the source but whether the " 'Officers could reasonably rely upon [the] information under the circumstances.' [Citations.]" (P. 375; italics added.) The corroboration there closely parallels the corroboration here. In *Lara* the court held that the officers could reasonably rely on the information, because "the investigating officers knew, independently of Meza's [arrestee's] information, that a felony had been committed. From the nature of the wounds they knew that Mitchell had been killed by one or more shotgun blasts; and from the fact he had been bound and shot in the back, they could reasonably infer the killing was murder. They could also infer that Mitchell's car had been involved in the perpetration of the crime, as it was found abandoned some two miles from the scene of the shooting. Meza, it will be remembered, told the officers that Lara and Alvarez were in Mitchell's car on the night in question, and that Alvarez subsequently said they had killed Mitchell by shooting him. Further independent investigation by the police disclosed that friends of Mitchell had last seen the deceased in the company of a man identified to be Meza; and the coroner's examination determined that death occurred in the period between the time that Meza had been taken home by Mitchell and the time he had been told of the shooting by Alvarez. Viewed together, these independently established facts justified the officers in placing reasonable reliance on Meza's information for the limited purpose here in issue." (P. 375.)

In the case at bench, the investigating officers were likewise possessed with independent knowledge that a felony had been committed. The officers could also reasonably infer, because of the multiple head wounds, that the killing was murder. The police did not have to infer that Hudson's car was involved in the crime for it was at the scene. Also, the informant here, as in *Lara,* placed the victim and the appellant in the

car on the night in question. There the informant placed the principals together less than one and one-half hours before the killing as determined by the coroner's examination; here the victim was found by the highway patrol a little more than an hour after the informant placed the principals in the same car. Only in two respects does the corroboration here fail to parallel *People* v. *Lara.* First, the informant there was identified by an independent source as being with the deceased when last seen; and second, the informant's statement directly implicated the accused. The importance of the informant being independently placed with the deceased is of no little import. Without this there was no corroboration that he even knew the deceased, let alone knew of the facts that transpired that day. Here, Miss Bennett claimed to know both appellant and the deceased, the former as an ex-boy friend, the latter as a then current boy friend. Certainly the type of information given and her description of both appellant and the deceased, coupled with her mother's phone call indicating that appellant was on his way over, plus his subsequent arrival, fully satisfy this requirement. There is here, however, no direct accusation that appellant committed the crime in question, although it would not be unreasonable, given the information about appellant carrying a .32 automatic, the placing of the principals together shortly before the crime, and other similar information, to infer that appellant had committed the crime. Given the circumstances of this case, we hold that viewed together, these independently established facts justified the officers, as was the case in *People* v. *Lara, supra,* in placing reasonable reliance on the informant's statements for the limited purpose here in issue.

This is not to say that such reliance would be established whenever the informant's information ties in directly with a known crime. " ' "[T]he informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of officers . . ." . . .' (*People* v. *Madden,* 2 Cal.3d 1017, 1023 [88 Cal.Rptr. 171, 471 P.2d 971].)" (*People* v. *Fein, supra,* p. 752.) Each case must turn on its own facts. (See also *People* v. *Ward* (1972) 27 Cal.App.3d 218 [103 Cal.Rptr. 671], and *People* v. *Terry,* 2 Cal.3d 362 [85 Cal.Rptr. 409, 466 P.2d 961].) However, in appropriate circumstances, such as here, and within limited parameters, reasonable cause may be established in a like manner when an officer is faced with overwhelming circumstantial evidence, and a suspect literally in the driveway. It would be unreasonable to conclude otherwise. Consequently, we hold that the arrest, under the circumstances herein involved, was based on reasonable cause and therefore subsequently obtained statements and items obtained pursuant to a search warrant based thereon were properly admissible at trial subject to

any subsequent conduct that would cause the application of an exclusionary rule.

## Miranda *Rights*

■ Appellant next contends that his judgment of conviction should be set aside because his *Miranda* rights were violated. His specific claim is that by indicating that he wanted an attorney at some time, but not at the time of the police interrogation, he properly invoked his privilege, and that the continuing interrogation by the police was unlawful. In the particular factual context surrounding this issue we must reject this contention.

■ It is, of course, well settled that in order to dispel the compulsion inherent in custodial surroundings and interrogation, the suspect must be properly warned that he has the right to remain silent; that anything he says can be used against him in a court of law; that he has the right to the presence of an attorney and if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 479 [16 L.Ed.2d 694, 726, 86 S.Ct. 1602, 10 A.L.R.3d 974]). ■ As a further protective device, the law provides that the interrogation must cease if the suspect indicates in any manner, at any time prior to or during questioning that he wishes to remain silent or that he wants an attorney.[2] This duty to cease interrogating, however, commences only upon the suspect's initial indication that he wishes to exercise his Fifth Amendment privilege. If the suspect is willing to discuss the case fully with the police officers after having been taken into custody and advised of his rights, *Miranda*[3] imposes no constitutional

---

[2] As expressed in *Miranda* and the cases following it, "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the *interrogation must cease*. [Fn. omitted.] At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. . . . If the individual states that he wants an attorney, the *interrogation must cease* until an attorney is present." (*Miranda* v. *Arizona, supra* at pages 473-474 [16 L.Ed.2d at page 723]. See also: *People* v. *Burton* (1971) 6 Cal.3d 375, 381 [99 Cal.Rptr. 1, 491 P.2d 793]; *People* v. *Randall* (1970) 1 Cal.3d 948, 954 [83 Cal.Rptr. 658, 464 P.2d 114]; italics added.)

[3] "In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. *Any statement given freely and voluntarily* without any compelling influences *is*, of course, *admissible in evidence.* The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . *Volunteered statements of any kind are not barred by the Fifth Amendment* and their admissibility is not affected by our holding today." (*Miranda* v. *Arizona, supra* at p. 478 [16 L.Ed.2d at p. 726]; italics added.)

inhibition to continued questioning (*People* v. *Randall* (1970) 1 Cal.3d 948, 955 [83 Cal.Rptr. 658, 464 P.2d 114]). This is in accord with *People* v. *Fioritto* (1968) 68 Cal.2d 714, 719 [68 Cal.Rptr. 817, 441 P.2d 625], where our Supreme Court held that "we prohibit only continued questioning after an individual has *once* asserted his constitutional rights." The crucial issue confronting us, therefore, is whether the trial court's finding that appellant freely, knowingly and intelligently waived his right to counsel during questioning is supported by sufficient evidence.

■ In deciding this question, we call to mind that while the cases emphasize that no particular form of words or conduct is necessary to an assertion of the privilege (*People* v. *Ireland* (1969) 70 Cal.2d 522, 535 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]), the attitude of the individual must be such as to show a *present* lack of willingness to discuss his case with the police (*People* v. *Burton* (1971) 6 Cal.3d 375, 382 [99 Cal.Rptr. 1, 491 P.2d 793]; *People* v. *Randall, supra* at p. 956). It likewise bears emphasis that the assertion of privilege or its waiver constitutes a question of fact which cannot be resolved by a per se rule but only on an ad hoc basis taking into account the special circumstances of each case (*People* v. *Smith* (1969) 270 Cal.App.2d 715, 724 [76 Cal.Rptr. 53]).[4]

■ When tested by these standards, the facts of the instant case conclusively establish that after having been taken into custody appellant was fully advised of each of his *Miranda* rights, including the right to remain silent and to talk to a lawyer *and have him present with him while he was being questioned.* After this admonition and the explanation of its meaning, appellant showed a willingness to, and did, discuss the case at great length with the police, gave selective answers to questions and asserted his right to an attorney in unequivocal terms when he felt his answer would be inculpatory. The record is entirely devoid of any evidence that appellant made his statement after a lengthy interrogation or incommunicado incarceration, or that he was threatened, tricked or cajoled into a waiver by the promise of the police (cf. *Miranda* v. *Arizona, supra,* p. 476 [16 L.Ed.2d pp. 724-725]).

[4]The trial court held a thorough hearing out of the jury's presence during which both the interrogating officer and appellant testified. The court independently found "beyond a reasonable doubt" that appellant (1) had been properly advised per *Miranda* and (2) had made a knowing waiver of his right to counsel. In addition the trial judge observed that the same issue had also been resolved against appellant in the course of rulings on his Penal Code sections 995 and 1538.5 motions.

These *express* findings, it is to be noted, point up the distinction between the instant case and *People* v. *Superior Court (Keithley)* (1975) 13 Cal.3d 406 [118 Cal.Rptr. 617, 530 P.2d 585]. In *Keithley,* the issue of *waiver* was not before the court. In addition, the trial court *impliedly* found that Keithley's *Miranda* rights had been violated by continuation of the interrogation "after defendant said he did not wish to discuss the case."

Wise administration of the waiver of the *Miranda* rule is, of course, of central importance to the continued health of the rule itself, which—as mentioned before—was promulgated upon the explicit premise that it could be validly waived. When the police have, as here, faithfully followed the exact procedure prescribed by the United States Supreme Court, the lower courts should be slow to mandate enlarged responsibilities alien to the duties and training of policemen (*United States* v. *Frazier* (1973) 476 F.2d 891, 899 [155 App.D.C. 135]). It follows that in the circumstances here presented we are not empowered to say that the government failed to sustain the burden of proof placed upon it, or that the finding of the trial court that appellant knowingly waived his right to counsel, and that his statement was freely and voluntarily given, were " 'palpably erroneous' " necessitating the overturning of the ruling of the trial court (*People* v. *Daniels* (1969) 1 Cal.App.3d 367, 374 [81 Cal.Rptr. 675]; *People* v. *Robinson* (1969) 274 Cal.App.2d 514, 520 [79 Cal.Rptr. 213]).

Appellant's argument claiming that his request for an attorney during a colloquy[5] preceding the actual interrogation amounted to an assertion of privilege precluding the police from asking any further questions misconceives the law. As noted above, *Miranda* only prohibits further *interrogation* if the suspect in fact requests an attorney, but leaves unaffected the right of the police to clarify whether the suspect understood his constitutional rights or intended to waive them. Accordingly, the case law draws a sensible distinction between clarification and interrogation. On the one hand, it *permits clarifying questions* with regard to the individual's comprehension of his constitutional rights or the waiver of them; on the other hand, it *prohibits substantive questions* which portend to develop the facts under investigation (*People* v. *Smith, supra* at p. 722; *United States* v. *Nielsen* (7th Cir. 1968) 392 F.2d 849, 852-853).

[5]After the *Miranda* admonition, but before the actual discussion of the case, the following colloquy took place between appellant and Sergeant Voorhies: Q: "Do you understand each of these rights that were explained to you? A: Yes, I do. Q: Having these rights in mind, do you wish to talk now? A: Say that again? Q: Having these rights in mind, which were just read and which you understand, do you wish to talk about the issue at hand right now? A: Uh, yes . . . attorneys and stuff like that I can't afford, one right at the moment. Q: Well, this says that an attorney can be appointed for you. You know if you can't afford one, one will be appointed to represent you. A: Well, I feel I need one. Q: O.K., you'd rather not talk about the case. A: No, I don't mind talking about the case, but I just feel I want it noted that I want an attorney. Q: Ok, you want it noted that you do want an attorney? A: Yes, but I don't mind talking to you. Q: Ok. You understand, then, everything that we've talked about and that you do want an attorney but not necessarily at this particular second. Is that right? A: Yes." In a factual setting very similar the court in *People* v. *Smith, supra,* at page 723, held that it was the "duty of the officers to proceed with the inquiry to fully develop what Miss Smith's desires were at that time."

The usefulness and inevitability of such practice is especially plausible in a case like the instant one, where the record displays a patent ambiguity with respect to both appellant's understanding of his rights and his exercise of the available privilege. An analysis of the colloquy in dispute reveals that when questioned as to whether or not he wished to remain silent, appellant did not give a straightforward answer but rather stated that at the moment he could not afford an attorney. Although when it was explained that he was entitled to an appointed attorney appellant answered that he needed one, his reply left open the further question whether he wished to avail himself of the attorney right away or whether he intended to remain silent until an attorney was appointed. Amid such uncertainty the officer was justified indeed in making further inquiries concerning appellant's intentions. The answers given to these clarifying questions abundantly disclose that appellant was willing to talk about the case and also that he wished to utilize the assistance of an attorney at a later time rather than on that occasion.

The proposition that clarifying questions should be admitted even after a suspect invokes his right to counsel finds support in *Miranda* itself, where approving a similar F.B.I. practice the Supreme Court stated: " ' "*When the person* who has been warned of his right to counsel *decides that he wishes to consult with counsel before making a statement, the interview is terminated* at that point . . . . *If he is indecisive in his request* for counsel, *there may be some question on whether he did or did not waive counsel. Situations of this kind must necessarily be left to the judgment of the interviewing Agent.*" ' " *(Miranda* v. *Arizona, supra,* at p. 485 [16 L.Ed.2d at p. 730]; italics added.)

We are satisfied that the cases cited by appellant are not in conflict with the conclusion here reached and are distinguishable from the case at bench. Thus, in *Fioritto,* the defendant refused to sign a waiver of constitutional rights which was rightly interpreted as an immediate invocation of his privilege; in *Randall,* the defendant placed a call to his attorney, thereby expressing his wish to avail himself of the attorney immediately; and both in *Ireland* and *Burton,* the defendants wished to see their parents without time qualification. The criterion that the assertion of the privilege must relate to the present rather than a remote, indefinite future, is well underlined in the cases. In elaborating on what behavior constitutes an invocation of the Fifth Amendment privilege, our Supreme Court has repeatedly pointed out that the words or conduct by which such privilege is invoked must be " 'inconsistent with a *present willingness* on the part of the suspect to discuss his case freely and completely with police *at that time*' " *(People* v. *Burton, supra* at p. 382;

*People* v. *Randall, supra* at p. 956; italics added). Needless to say, this requirement of immediacy is in manifest contrast with the case at bench where appellant clearly expressed that he wished to enlist the assistance of counsel at some future time.

The judgment is affirmed.

Taylor, P. J., and Rouse, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 15, 1975.