125 Cal.App.3d 590 (1981)
178 Cal. Rptr. 159
In re BRIAN W., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent,
v.
BRIAN W., Defendant and Appellant.
Docket No. 38902.
Court of Appeals of California, Second District, Division One.
November 12, 1981.
*593 COUNSEL
Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Russell I. Lynn and Richard Avila, Deputy State Public Defenders, for Defendant and Appellant.
George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab and Donald J. Oeser, Deputy Attorneys General, for Plaintiff and Respondent.
OPINION
LILLIE, J.
The minor appeals from orders sustaining petition charging him with two counts of sodomy and two counts of attempted oral copulation on a one-and-one-half-year-old female, and committing him to the California Youth Authority.
Alexis was born November 11, 1978; the minor, a boy 15 years old, was left to babysit with Alexis by her mother; when her mother returned, the door was locked and the minor delayed opening it; when she entered the room she observed Alexis on the floor and blood on and running down the inside of Alexis' legs; Alexis was crying and her mother asked the minor what happened; he said he did not know, that he went to change her diaper and found her like that; Alexis was wearing nothing and her mother saw no soiled diaper. Alexis was taken to the hospital where she was examined by a physician. A half hour later the minor was at the hospital and asked the mother how Alexis was and what was going on. Dr. Palmer found two shallow fissures at the rectal opening; they were then non-bleeding but there was dried blood in the area of Alexis' feet; since there were no lacerations on the feet to account for it he concluded it probably came from the rectal area. It was his opinion that some object had been inserted into the rectal area, that the fissures or tears were caused by something large passing through *594 the rectal opening. The injuries on the child were consistent with the act of sodomy but not necessarily diagnostic of such an act.
A tape recording of a conversation between the minor and the police, which included the minor's confession was played in open court.
The defense consisted of the testimony of Dr. Apthorp, a court certified pediatrician who explained other ways in which the fissures or tears in the rectum could occur. The minor did not testify.
The sole appellate issue is the admissibility of the minor's confession.
At the hearing on the admissibility of the confession that portion of the tape relating to the admonition was played. It establishes that the officers waited until the minor's mother arrived, and the entire conversation was in her presence. Officer Mercier read his constitutional rights and asked the minor if he understood each of the rights explained to him; he answered "Yes." Then the following took place:
"`DETECTIVE MERCIER: Do you wish to give up the right to remain silent?
"`THE MINOR: No.
"`DETECTIVE MERCIER: You don't want to talk to us about it?
"`THE MINOR: I will talk to you about it.
"`DETECTIVE MERCIER: Let me say it again. Do you wish to give up your right to remain silent?'
"THE COURT: Will you play that back. (The playing of the tape was continued as follows.)
"`DETECTIVE MERCIER: Do you understand each of these rights I have explained to you?
"THE MINOR: Yes.
"`DETECTIVE MERCIER: Do you wish to give up the right to remain silent?
*595 "`THE MINOR: No.
"`DETECTIVE MERCIER: You don't want to talk to us about it?
"`THE MINOR: Yeah, I want to talk to you about it.
"`DETECTIVE MERCIER: Okay, let me say it again. Do you wish to give up your right to remain silent?
"`MINOR'S MOTHER: He doesn't understand.
"`LIEUTENANT HIGBEE: What that means, Brian, is if you give up that right to remain silent then you are willing to talk to us. Is that what you wish to do, Brian?
"`THE MINOR: Yes.
"`DETECTIVE MERCIER: Okay, do you wish to give up the right to speak to an attorney and have him present during questioning?
"`THE MINOR: No.
"`DETECTIVE MERCIER: Do you wish to give up the right to have an attorney? Do you know what an attorney is?
"`THE MINOR: Uh-huh.
"`DETECTIVE MERCIER: An attorney or lawyer? Okay, do you wish to give up the right to have him here, an attorney or lawyer?
"`THE MINOR: No.
"`DETECTIVE MERCIER: Do you want to have an attorney or lawyer present? Let me explain.
"`MINOR'S MOTHER: Can I expedite this a little?
"`DETECTIVE MERCIER: Sure.
"`MINOR'S MOTHER: He is 15, but I just found out from his psychiatrist that he has an IQ of 80 and he also has the mentality and understanding of about a 10 or 11-year-old, so this is why things have *596 to be explained to him in every day terminology so that he will understand you and then you may even have problems.
"`DETECTIVE MERCIER: Okay. What I am trying to explain to you, Brian, is that you have a right to have an attorney or lawyer here with you and if you give up that right to have one here, what we are asking is do you want one here or do you not want to have an attorney here?
"`MINOR'S MOTHER: Before you talk to them, in other words.
"`THE MINOR: No.
"`MINOR'S MOTHER: I have already contacted our attorney as soon as I got home from the hospital and he said that as far as he knew that Brian should be remanded into my custody and may be there will be a hearing or whatever and not to worry about it, that, you know, that that is just the way because I was afraid he was going to go to jail or something if there was proof from the doctor that anything did happen. I have never been up against anything like this before so it is all new to me.
"`LIEUTENANT HIGBEE: Can I ask you a question, Mrs. W.? Do you want us to talk to your son without an attorney?
"`MINOR'S MOTHER: I don't care, I just want to get to the bottom of this and I want him to tell the truth because if he did anything that means that he needs more help than what he is already getting.
"`LIEUTENANT HIGBEE: That is what we want to do. If he did then we want to get him help and that is what I tried to explain to you outside, you know, that our primary concern obviously is the baby and secondarily if there is any problem then we are going to make sure that Brian gets help.
"`MINOR'S MOTHER: Brian, you can tell the truth because 
"`THE MINOR: I already made up my mind. I am going to tell the truth.
"`MINOR'S MOTHER: Well, please do because you are only hurting yourself if you don't tell the truth. This is something very serious. It is *597 not like shoplifting or, you know, something like that. This is something that is very serious. You know what I went through when I was a child. I had the same thing happen to me and you have got to tell the truth.
"`DETECTIVE MERCIER: Do you want to tell us, Brian, what happened?
"`THE MINOR: I did what everybody says.'" (Italics added.)
The minor called a doctor of psychology, Michael Maloney, who listened to the tape and then questioned the minor concerning the admonitions and waivers. He testified that if he had to make a "guess," the minor did not understand his rights any more than he did when he (Maloney) talked to him; based on his own evaluation of the minor and review of his school records, the minor did not understand his rights; the minor had a verbal I.Q. of 81 and his mental age on that basis was 11 or 12 but he was not mentally retarded, and fit the category of "borderline intelligence"; he did not believe the minor to be totally incapable of understanding his Miranda rights and he thought he could be taught what they mean fairly easily.
Officer Mercier testified that she read to the minor his Miranda rights; when the minor answered "no" to her question whether or not he wished to give up his right to remain silent, she was not sure he understood her question, and she was not sure he understood "that in fact his no was to be a yes which is a common mistake," that "quite frequently" this will "come up with people"; she believes he understood his right but did not understand his answer; in her experience many people do not understand it by the way the question is phrased, "by the way it is read," so she asked him if he did want to talk to her; she asked other questions because she felt the minor still did not understand the question; from her initial conversation with him she did not perceive he had any mental difficulties or was retarded, but she wanted to make sure that he understood the question; he did not appear to be puzzled, rather was listening to her but not quite understanding; she was not trying to change his mind; from the totality of the circumstances it did not appear that the minor was unwilling to talk to her nor did it appear he wanted someone else present; it appeared that he did ultimately understand her questions and did not manifest any intent or desire not to talk to her or discuss the case with her.
*598 After listening to the tape several times and hearing the witnesses, the judge made various findings[1] and rejected the application of People v. Fioritto (1968) 68 Cal.2d 714 [68 Cal. Rptr. 817, 441 P.2d 625] because he concluded that the minor at no time "in reality invok[ed]" his constitutional rights; "... the minor at all times was willing to talk to the police." He also considered the presence of the minor's mother after she had spoken to an attorney, and said "I think it is especially applicable in a case where the minor does not at any time in reality invoke his rights." (1a) We conclude that that portion of the tape relating to the giving of Miranda rights considered in its complete context and in light of Officer Mercier's testimony, reasonably lends itself to the construction and interpretation afforded it by the judge to support his findings that the minor in fact did not invoke his constitutional rights, his waiver was voluntary as was the confession and that the confession was properly admitted in evidence.
(2) Once a suspect indicates in any manner at any time prior to or during questioning that he wishes to remain silent or that he wants an attorney, interrogation must cease and any statement elicited thereafter is inadmissible (People v. Pettingill (1978) 21 Cal.3d 231, 240-241 [145 Cal. Rptr. 861, 578 P.2d 108]), however, if the suspect is willing to discuss the case fully after having been taken into custody and advised of his rights, Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] imposes no constitutional inhibition to resumption of questioning.
(1b) Appellant contends that once he asserted his right to remain silent and to the legal assistance of counsel, all interrogation should have *599 ceased, and his mother's presence as his advisor did not meet the accepted standard of effective legal representation which would have permitted the interrogation to continue.
The rejection of this contention lies in the judge's finding and the evidence supporting it, that when the minor answered in the negative whether he wished to give up his right to remain silent and to have an attorney present, in reality he did not intend to assert or invoke his rights; that at all times he insisted he wanted to talk to the officers, and when his rights were explained to him by Lieutenant Higbee in language he understood, he responded that he was willing to talk to the police and later, that he had already made up his mind that he was going to tell the truth. The judge found that the officers' questions were clarifying questions and not interrogation in the sense that they were substantive questions which portend to develop the facts under investigation. We cannot, as does appellant, characterize the clarifying questions as "repeated challenges to his invocation of the right to silence and legal counsel" nor can we agree with his further assertion that police "shrewdly leveraged Mrs. W. into pressuring [him] to discuss the substantive points of the incident." In sum, the record supports the judge's conclusion that the minor did not "at any time in reality invoke his rights," and in fact knowingly and voluntarily waived his constitutional rights, which assertion of privilege or its waiver constitutes a question of fact which cannot be resolved by a per se rule but only by taking into account the special circumstances of each case. (People v. Turnage (1975) 45 Cal. App.3d 201, 210 [119 CA3d 237].) (3) The United States Supreme Court enunciated the proper test in Fare v. Michael C. (1979) 442 U.S. 707, 724-725 [61 L.Ed.2d 197, 211-212, 99 S.Ct. 2560] as follows: "[T]he question whether the accused waived his rights `is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case.' Thus, the determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forego his rights to remain silent and to have the assistance of counsel. Miranda v. Arizona 384 U.S., at 475-477."
Clearly the authorities permit clarifying questions even after a suspect says he asserts his constitutional rights, and that proposition finds support in Miranda v. Arizona (1966) 384 U.S. 436, 485 [16 L.Ed.2d *600 694, 729, 86 S.Ct. 1602]. Nothing in Miranda precludes the police from clarifying with the suspect whether he understands the questions relating to his constitutional rights and whether by his answers he intends to waive them. It is just as important for police to make certain a suspect means what he says in his answer which asserts his rights as it is to ascertain if he understands the questions sufficiently to knowingly and intelligently waive those rights. (4) Although after a suspect has indicated he wishes to invoke his Miranda rights the police are prohibited from asking substantive questions which portend to develop the facts under investigation (People v. Turnage (1975) 45 Cal. App.3d 201, 211 [119 Cal. Rptr. 237]), they are permitted to clarify whether he comprehended his rights, the question and his answer or intended to waive his Miranda rights, and explain them to him. (1c) It was for the trial judge to explore the true intention of the minor and there can be no doubt that in considering "the totality of the circumstances surrounding the interrogation" that the minor at all times wanted to talk to the officers, and the judge so found. In a similar factual setting defendant told police that he wanted it noted that he wanted an attorney; the officer continued to question him concerning this and defendant's answers indicated that although he wanted an attorney he did not mind talking to the officer; on appeal he claimed this to be an assertion of privilege precluding the police from asking further questions. The court said in People v. Turnage, supra, 45 Cal. App.3d 201 at page 211, that such argument misconceives the law: "... Miranda only prohibits further interrogation if the suspect in fact requests an attorney, but leaves unaffected the right of the police to clarify whether the suspect understood his constitutional rights or intended to waive them. Accordingly, the case law draws a sensible distinction between clarification and interrogation. On the one hand, it permits clarifying questions with regard to the individual's comprehension of his constitutional rights or the waiver of them; on the other hand, it prohibits substantive questions which portend to develop the facts under investigation [citation]." (Original italics.) (See also People v. Watson (1977) 75 Cal. App.3d 384, 395 [142 Cal. Rptr. 134].) In People v. Smith (1969) 270 Cal. App.2d 715 [76 Cal. Rptr. 53], the court held in a similar situation that it was the "duty of the officers to proceed with the inquiry to fully develop what Miss Smith's desires were at that time." (P. 723.)
We do not reach the issue of whether pressure was exerted on the minor to "change his mind" because of our conclusion that he did not invoke his constitutional rights, at all times intended to and wanted to *601 talk to the officers and waived his Miranda rights. For the same reason we deem it unnecessary to discuss those issues premised on the theory that the minor invoked his constitutional rights, i.e., that interrogation should have ceased, his mother was not legally competent to permit the interrogation to continue and the minor was advised by some one (his mother) other than an attorney "to reverse his initial assertion of those rights."
This leaves the issue of the voluntariness of the waiver and his confession. (5) Appellant claims that the waiver of his rights was the product of a promise by police to get help for him. The argument is based on all of the statements of Lieutenant Higbee and the minor's mother relating to obtaining help for the minor. However, only those statements made prior to the minor's assertion that he had already made up his mind and was going to tell the truth are pertinent. In connection with Officer Mercier's attempt to explain the minor's right to have a lawyer present, his mother asked if she could "expedite this a little" and explained that because the minor was 15 with an I.Q. of 80 and understanding of about 10 or 11 years old, that "things have to be explained to him in every day terminology so that he will understand you...." Officer Mercier then explained to the minor concerning his right to a lawyer and said to him "what we are asking is do you want one here or do you not want to have an attorney here?" and his mother interjected "Before you talk to them, in other words," and the minor answered "No." The minor's mother explained that she had already contacted their attorney and he gave her some advice. Lieutenant Higbee then asked Mrs. W. "Do you want us to talk to your son without an attorney?" and she answered "I don't care, I just want to get to the bottom of this and I want him to tell the truth because if he did anything that means that he needs more help than what he is already getting." Lieutenant Higbee replied "That is what we want to do. If he did then we want to get him help and that is what I tried to explain to you outside, you know, that our primary concern obviously is the baby and secondarily if there is any problem then we are going to make sure that Brian gets help." Then the following occurred: "MINOR'S MOTHER: Brian, you can tell the truth because  [¶] THE MINOR: I already made up my mind. I am going to tell the truth."
Appellant's contention that his waiver was the product of a promise to get help is inconsistent with his three prior statements that he wanted to talk to the officers and second, with his assertion to his mother, interrupting *602 her conversation with him, that he already made up his mind to tell the truth. Clearly neither his mother nor any promise of help by her or the police had anything to do with his decision to waive his rights and most certainly had nothing to do with his decision to be truthful. Neither his waiver nor his confession was elicited by any promise of benefits or leniency, express or implied. In this connection we note that "`[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made" (People v. Jimenez (1978) 21 Cal.3d 595, 611-612 [147 Cal. Rptr. 172, 580 P.2d 672]); in no way can Lieutenant Higbee's statement be construed that the minor might reasonably expect benefits in the nature of lenient treatment at the hands of the police, prosecution or court in consideration of making a statement. Again appellant asserts that the promise to get help by the police was used to "leverage" the minor's mother to get him to talk but this is not supported by the record which shows that the minor at various times before she even entered the conversation told police he wanted to talk to the officers, and the minor's mother said she did not care if an attorney was present when they talked to her son, she wanted to get to the bottom of it and wanted him to tell the truth. This statement she made before the matter of getting help was ever mentioned by police and after he had already waived his privilege against self-incrimination.
(1d) Considering the totality of the circumstances appellant can make no case of involuntary waiver. Even though twice he answered in the negative to the question whether he wanted to give up his right to remain silent, three times he told the officers he wanted to talk to them. Once these rights were explained to him he said he wanted to talk to the officers and all indications are that during that time he intended to and truly wanted to talk to them. (See In re Norman H. (1976) 64 Cal. App.3d 997, 1003 [136 Cal. Rptr. 145].) The trial judge could not, nor can we, consider his negative answers as reflecting the minor's understanding or true intent. Just as there must be an intentional waiver of rights there must also be an intentional invocation of those rights. Once his rights were explained in language he could understand, the minor asserted his desire to talk to the police. He had an I.Q. of 81 and the mental age of 11 or 12 but this is only a factor to be considered in determining whether he lacked the ability to understand his rights. The "`"totality of circumstances" [citations] surrounding the interrogation must be considered.' [Citation.]" (People v. Watson (1977) 75 Cal. *603 App.3d 384, 396 [142 Cal. Rptr. 134] [I.Q. of 65, signs of chronic organic brain damage and schizophrenia (p. 396)]; In re Norman H. (1976) 64 Cal. App.3d 997, 1002 [136 Cal. Rptr. 145] [15-year-old boy with intelligence quotient of a 7 or 8 year old, I.Q. 47]; People v. Lara (1967) 67 Cal.2d 365, 378-379 [62 Cal. Rptr. 586, 432 P.2d 202] [I.Q. between 65 and 71]; People v. Isby (1947) 30 Cal.2d 879, 897-898 [186 P.2d 405] [I.Q. of 58].) In In re Norman H., supra, 64 Cal. App.3d 997, the court found sufficient substantial evidence to support the determination of the trial court that the confession was voluntary. Said the court at page 1003: "One of the evils sought to be eliminated by the Miranda rule is obtaining of information from a defendant who truly does not want to talk, but whose silence or resistance to speak is overcome by coercion or persuasion. Here although defendant's intelligence is very low, there is no showing whatever that he truly did not want to talk, or that his desire was in any way overcome by reason of the police or anyone else taking unfair or unlawful advantage of his ignorance, mental condition, or vulnerability to persuasion. [¶]... Neither a low I.Q. nor any particular age of minority is a proper basis to assume lack of understanding, incompetency, or other inability to voluntarily waive the right to remain silent under some presumption that the Miranda explanation was not understood. The `knowing' element of the waiver of the Miranda rights can be so misconstrued and extended to such a degree that it would prevent the use of voluntary statements made to the police without any violation of their duty to advise a defendant."
The record is devoid of any evidence that the minor made his statement after a lengthy interrogation. There was no atmosphere of coercion, no prolonged questioning or coercive tactics, no threats or promises of leniency. He was not threatened, tricked or cajoled into a waiver by any promise of the police. There was no deliberate ploy to "soften up" the minor. There exists in the record no improper inducements which were the motivating cause for the minor to waive his constitutional rights. He did not waive his rights because of any so-called promise but indicated his desire to tell the truth long before the matter of "getting help" was mentioned, and before the police could have "leveraged" his mother to impose upon him. The minor's mother was present which is a factor demonstrating that the waiver and the statements made by the minor were voluntary. (People v. Lara, supra, 67 Cal.2d 365, 378-379; In re Anthony J. (1980) 107 Cal. App.3d 962, 972-973 [166 Cal. Rptr. 238]; In re Patrick W. (1978) 84 Cal. App.3d 520, 525 [148 Cal. Rptr. 735].) We conclude that the trial judge properly *604 ruled that the minor knowingly and voluntarily waived his constitutional rights and the statements were voluntarily made.
The order is affirmed.
Spencer, P.J., and Hanson (Thaxton), J., concurred.
A petition for a rehearing was denied December 8, 1981, and appellant's petition for a hearing by the Supreme Court was denied January 27, 1982.
NOTES
[1] Among other things the judge found Officer Mercier "to be totally credible" and commented that the police must assure themselves that the minor understands, her testimony was that she felt he did understand, and he thought it was entitled "to quite a bit of weight because she works juvenile and has seen a lot more kids than this man [Dr. Maloney] has ever seen"; that she was in good faith in asking the minor whether he, in fact, was invoking his rights by use of the word "No," and whether it was clear in his own mind what he meant; that there was "no attempt" on the part of police to try to dissuade the minor from invoking his rights but merely an attempt to determine if he was in fact invoking his constitutional rights; that the police had tried to make his rights meaningful to the minor; that there was no pressure and police were only trying to understand what the minor really meant; that his mother who was present at all times had already spoken to an attorney and was being guided by his advice; that this is not a situation in which the minor did not want to speak and his mother forced him to; and that the whole tenor of the conversation "is a conversation with a minor who at all times wanted to speak with the police. [¶] The minor wanted to tell the truth, his mother wanted him to tell the truth. It is not a situation where the minor was really in any doubt at any time about talking with the police."